JOHN H. TOONE v. JOHN BAXTER ADAMS, KENNETH E. DEAL AND RALEIGH BASEBALL, INC.

(Filed 10 July 1964.)

**1. Negligence § 1—**

Breach of contract cannot give rise to a cause of action in tort, nor may a contract substitute a different standard of care for that prescribed by the common law, but a contract may create a relationship between the parties out of which a duty arises, the breach of which may constitute negligence.

**2. Games and Exhibitions § 3—**

In this action by an umpire against a baseball club and its manager to recover for an assault made by a patron, the complaint alleged the relationship between the parties, and therefore allegations in the complaint

setting forth contractual duties of the club to the umpire in respect to his protection were properly stricken on motion.

**3. Pleadings § 34—**

Allegations which are irrelevant or evidentiary are properly stricken on motion. G.S. 1-153.

**4. Negligence § 1;  Games and Exhibitions § 3—**

Rules governing the conduct of games may be admissible in evidence in proper instances as tending to show the care required of the parties in the relationship created by the contract, even though allegations in regard to such rules may properly be stricken from the complaint as being evidentiary.

**5. Games and Exhibitions § 3—**

Allegations to the effect that two policemen were escorting plaintiff umpire to the dressing room for protection when plaintiff was assaulted without provocation or warning by a patron at the game, *held* to affirmatively disclose that failure to provide police protection was not one of the proximate causes of the injury.

**6. Negligence § 1—**

The law imposes upon every person who enters upon an active course of conduct the positive duty to use ordinary care to protect others from harm, and if a person intentionally creates a situation which he knows, or should know, is likely to cause a third person to act in such a manner as to create an unreasonable risk of harm to another, he may be held liable for the resulting injury, but he may not be held liable if the wrongful act on the part of the other could not have been reasonably foreseen under the circumstances.

**7. Games and Exhibitions § 3;  Assault and Battery § 1— Baseball club and manager held not liable for assault made on umpire under facts.**

Allegations to the effect that during the progress of a baseball game the manager of one of the teams on several occasions went on the field and violently protested the decision of the umpire, that the last time the umpire had to remove the manager from the game and the manager told the umpire that the umpire would receive no help from the manager nor from his players in getting off the field, that after the termination of the game the umpire walked unharmed to home plate then proceeded to an exit from the field and obtained two policemen to accompany him, and that while on the way with the policemen to the dressing room, a fan, without warning, made an unprovoked assault on him, *held* insufficient to state a cause of action against the manager or the ball club, since the manager was not present when the assault was made and therefore could not have incited its commission, nor could he have reasonably foreseen that his conduct in protesting the decision would at a later time cause a patron to make an assault.

APPEAL by plaintiff from *Walker, S. J.,* December 1963 Civil A Session of WAKE.

Plaintiff appeals from an order striking certain portions of his complaint and sustaining the defendants' demurrer to the complaint as thereafter amended.

The complaint, after the motion to strike had been allowed, alleged the following facts:

In June 1960 plaintiff was an umpire for the Carolina League, Inc. The defendant Raleigh Baseball, Inc., was a member of the Carolina League and, under its auspices, operated a baseball club known as the Raleigh Caps of which defendant Kenneth E. Deal was manager. On the night of June 16, 1960 plaintiff was acting as field umpire at a ball game between the Raleigh Caps and the Greensboro Yankees, both teams being members of the Carolina League. The game was being played in Raleigh and the paid attendance was 3,452. During the second inning, plaintiff had to make a decision whether a ball had been caught by a Raleigh outfielder. He ruled that the player had "trapped" the ball between his glove and the ground and thus it had not been caught. When plaintiff made this decision, defendant Deal charged onto the field and engaged in a verbal controversy with plaintiff. During the third inning plaintiff called a player of the Raleigh Caps out at first base. Again Manager Deal rushed onto the playing field and violently protested the decision. He threatened that if plaintiff made another decision with which he disagreed, he would behave in such a manner that plaintiff would be forced to eject him from the game and his ejection would result in extreme hostility towards plaintiff on the part of the partisan fans. Thereafter, during the ninth inning, plaintiff called a batter-runner safe at first base. The Raleigh players began arguing with plaintiff and defendant Deal again "charged on the field" and protested the decision. During the controversy, the Greensboro Yankees scored two runs and the man on first base advanced to second. The Raleigh players were pushing and shoving the plaintiff who requested defendant Deal to control his players. The request was deliberately disregarded. Deal cursed plaintiff and stated that plaintiff would now be forced to "run him out of the game." Plaintiff promptly informed Deal that he was removed from the game. Before leaving the field, Deal argued and protested for approximately ten minutes. He told plaintiff that he would receive no help from him or his players in getting off the field.

When the game ended fans poured over the right field fence onto the playing field, cursing and challenging plaintiff to fight. Despite these hostile demonstrations plaintiff walked unharmed to home plate where he met his associate umpire. They proceeded to the exit from the

playing field where they obtained two policemen to accompany them to the dressing room. On the way, defendant Baxter Adams, without any cause or provocation, and without warning, struck plaintiff a blow on his head thereby causing him injury.

Plaintiff alleged that the defendants Deal and Raleigh Baseball, Inc. owed him the duty to conduct themselves so as not to incite the fans against him and also to provide him with safe passage from the playing field "either by police or by other agents of the corporation" immediately after the game; that their breach of these duties proximately caused his injuries. He averred that defendants should reasonably have foreseen that Deal's arrogant conduct in charging upon the playing field and his threatening manner and attitude toward the plaintiff would incite a partisan crowd against plaintiff and result in an assault upon him by one or more persons. In conclusion, plaintiff alleged that his injuries were proximately caused by the joint "wilful, wanton, and malicious negligence of the defendants" Adams and Deal for which Raleigh Baseball, Inc. was also liable under the doctrine of *respondeat superior*. He prayed that he recover both compensatory and punitive damages.

In paragraph 6 of his complaint, plaintiff set out certain rules and regulations of the National Association of Professional Baseball Leagues under which the Carolina League operates. *Inter alia,* these rules provide that the home team shall furnish police protection sufficient to preserve order at a game; they authorize the umpire to remove managers, players, spectators, or employees from the game or field for a violation of the rules or unsportsmanlike conduct; and they declare that his "decisions which involve judgment" shall be final and that players or managers shall not object thereto. Upon motion of defendants, these rules and regulations were stricken from the complaint on the grounds that they were evidentiary. Those portions of the complaint wherein plaintiff referred to the rules were likewise stricken.

The defendant Adams filed no answer and judgment by default and inquiry was rendered against him. He is not a party to this appeal.

When the action came on for trial, defendants Deal and Raleigh Baseball, Inc. demurred *ore tenus* to the complaint for failure to state a cause of action in that (1) the alleged acts of Deal did not constitute a breach of any legal duty which the defendants owed to the plaintiff; (2) the facts alleged show no causal relation between the conduct of Deal and the assault by Adams; and (3) Deal could not reasonably have foreseen an assault by a spectator. The court sustained the demurrer and the plaintiff appealed.

*Bailey, Dixon & Wooten for plaintiff.*

*Smith, Leach, Anderson & Dorsett for Kenneth E. Deal and Raleigh Baseball, Inc., defendants.*

SHARP, J.  The first question raised on this appeal is whether the rules and regulations of the National Association of Professional Baseball Leagues, included in the complaint as paragraph 6, were properly stricken. Plaintiff contends that the rules were properly included in the complaint because they constitute the contract which "governs the relationship between the plaintiff and the demurring defendants."

It is well settled in North Carolina that where a contract between two parties is intended for the benefit of a third party, the latter may maintain an action in contract for its breach or in tort if he has been injured as a result of its negligent performance. *Gorrell v. Water Supply Co.*, 124 N.C. 328, 32 S.E. 720; *Jones v. Elevator Co.*, 234 N.C. 512, 67 S.E. 2d 492; *Council v. Dickerson's, Inc.*, 233 N.C. 472, 64 S.E. 2d 551. The parties to a contract impose upon themselves the obligation to perform it; the law imposes upon each of them the obligation to perform it with ordinary care and they may not substitute a contractual standard for this obligation. A failure to perform a contractual obligation is never a tort unless such nonperformance is also the omission of a legal duty. *Council v. Dickerson, Inc., supra.* The contract merely furnishes the occasion, or creates the relationship which furnishes the occasion, for the tort. *Peele v. Hartsell*, 258 N.C. 680, 129 S.E. 2d 97; *Pinnix v. Toomey*, 242 N.C. 358, 87 S.E. 2d 893; 12 Am. Jur., *Contracts* § 458; 34 N.C.L. Rev. 253.

The allegation that plaintiff was an umpire for the Carolina League, Inc., of which these defendants were members, remains in the complaint, and establishes the relationship between the parties to this appeal for the purpose of demurrer. Out of this contractual relationship a legal duty devolved upon these defendants to use due care to protect the plaintiff and to refrain from endangering his personal safety while he was acting as their umpire. The inclusion of the specific rules of the Baseball League was, therefore, unnecessary to establish the relationship between these parties. Since the plaintiff, having sued in tort, must accept the standard of care prescribed by the common law, any contract provision prescribing a greater, lesser, or the same standard of care is not relevant to the issue of actionable negligence and should be stricken on motion. *Pinnix v. Toomey, supra.* Therefore, paragraph 6 of the complaint was properly stricken under the rule that a complaint should not contain irrelevant or evidentiary matter. G.S. 1-153.

This ruling, of course, relates only to the pleadings. It would not necessarily determine the admissibility of the stricken rules as *evidence* if this case were one for the jury. Rules governing the conduct of games, workmen in industry, and the operation of private business projects have, in proper cases, been held admissible on the theory that they constitute some indication of the care required under the circumstances and are properly considered by the jury in determining whether defendants' conduct measures up to the standard of the reasonably prudent man. See *Everett v. Goodwin*, 201 N.C. 734, 161 S.E. 316; Annot., 50 A.L.R. 2d 16.

The second question presented is whether plaintiff stated a cause of action against defendants for damages proximately caused by their breach of a duty arising out of the contractual relationship between them.

Plaintiff contends (1) that defendants breached the duty which the home team owed him as umpire, to provide adequate protection for his personal safety during and immediately after the game, and (2) that defendant Deal, acting within the scope of his employment by Raleigh Baseball, Inc., deliberately created an attitude of hostility and personal enmity towards plaintiff which aroused the partisan spectators and thereby incited Adams to commit the assault of which plaintiff complains.

For present day fans, a goodly part of the sport in a baseball game is goading and denouncing the umpire when they do not concur in his decisions, and most feel that, without one or more rhubarbs, they have not received their money's worth. Ordinarily, however, an umpire garners only vituperation — not fisticuffs. Fortified by the knowledge of his infallibility in all judgment decisions, he is able to shed billingsgate like water on the proverbial duck's back. Illustrative of this faculty is the storied conversation of three umpires who were discussing matters of mutual interest:

"Balls and strikes," said one, "I call them as I see them."

"Balls and strikes," said the second, "I call them as they are."

"They are not balls and strikes until I call them," decreed the third.

It is not necessary for us to decide whether a proper concern for the safety of an umpire today requires the members of the League for which he works to furnish an armed guard to protect him from the baseball public. In this case plaintiff is stymied by his allegation that two policemen and an assistant umpire were escorting him at the time he was assaulted by one irate fan out of an attendance of 3,452. How many policemen would he contend were reasonably required for his

adequate protection? Hindsight may indicate that greater vigilance was required of the two who were then acting as plaintiff's escort, but it does not disclose that more were needed to protect plaintiff from the one man who assaulted him. The allegations of the complaint affirmatively disclose that the lack of police protection was not one of the proximate causes of plaintiff's injury.

We come now to the next aspect of the second question. Viewed in the light most favorable to the plaintiff, do the allegations of the complaint justify the inference that Deal's conduct was the proximate cause of Adams' assault upon the plaintiff?

The law imposes upon every person who enters upon an active course of conduct the positive duty to use ordinary care to protect others from harm and a violation of that duty is negligence. It is immaterial whether the person acts in his own behalf or under contract with another. *Council v. Dickerson's, Inc., supra.* An act is negligent if the actor intentionally creates a situation which he knows, or should realize, is likely to cause a third person to act in such a manner as to create an unreasonable risk of harm to another. Restatement, *Torts* §§ 302, 303. What is the application of this general statement of the law to the facts of this case?

"Civil liability for an assault and battery is not limited to the direct perpetrator of the act charged; it extends to any person who by any means encourages or incites that act or aids and abets it." 6 Am. Jur. 2d, *Assault and Battery* § 128. Accordingly, all those who participate directly or indirectly in an assault and battery are jointly and severally liable therefor whether or not they were actually present when the assault was committed. However, there can be no joint liability unless there was such procurement, instigation, or incitation as constitutes, in effect, concert of action. 6 C.J.S., *Assault and Battery* § 27. "One is not responsible for a beating inflicted by another, however wrongful it may be, simply because he thinks the punishment deserved, or is pleased at it, or thinks well of it. He must do something more." *Blue v. Christ*, 4 Ill. App. 351. Plaintiff makes no allegation that there was ever any personal contact or concert of action between Deal and Adams. Apparently, the theory of plaintiff's case is that Deal attempted to incite mob action but succeeded only in inciting Adams. The allegation of the complaint is that Deal intended that his actions should create an extremely hostile feeling toward the plaintiff. However, it does not follow that he actually intended or should reasonably have anticipated that one or more persons would assault plaintiff as a result.

"'One is bound to anticipate and provide against what usually happens and what is likely to happen; but it would impose too

heavy a responsibility to hold him bound in like manner to guard against what is unusual and unlikely to happen or what, as it is sometimes said, is only remotely and slightly probable'." *Hiatt v. Ritter*, 223 N.C. 262, 25 S.E. 2d 756 (1943).

In *Krudwig v. Koepke*, 227 Wis. 1, 277 N.W. 670, plaintiff was held entitled to recover against two defendants, master and servant, for an assault by the servant when the master was "miles away." The master, as he had promised to do, paid the servant's fine when he was convicted of assault and battery in the criminal court. The court held both defendants liable in the civil action on the ground that the evidence established a conspiracy. In doing so, it made a distinction between *inciting* and *procuring* an assault:

"In order that one may incite another, that is, to move another to action, to spur him on, persuade him, it is necessary that he be present at the scene of action; otherwise he is directing, ordering, or procuring. In one instance the initiative is with the actor, in the other the initiative is with the one directing, ordering or procuring. The distinction is a very narrow one. . . ."

Under these definitions the absent Deal could not have been guilty of inciting, and plaintiff does not contend that he procured the assault.

We have found no case in this jurisdiction or elsewhere which parallels this one, and counsel have cited us to none. A engages in an altercation with B. C looks on and becomes excited or enraged. Several minutes later C assaults B who then contends that A is liable for inciting C.

The case of *Ash v. 627 Bar, Inc.*, 197 Pa. Super 39, 176 A. 2d 137, is somewhat analogous. There, plaintiff was a patron in defendant's Bar where a shuffle-bowling game was in progress when arguments developed among the players. After plaintiff had bought one round of drinks the bartender demanded that he pay for more. When plaintiff refused, the bartender became furious and shouted, "If you don't get some more money on the bar, I'm going to beat you up." Plaintiff attempted to leave and the bartender started to run round the bar waiving his hands at plaintiff. Plaintiff was knocked unconscious and seriously injured by a blow from behind. The evidence does not reveal whether the blow came from another patron or the bartender. The Court, in holding the 627 Bar, Inc. liable for plaintiff's injuries, said that it had a duty to maintain an orderly place and to protect plaintiff from assaults and insults from employees and patrons both. The court declared that the blow which plaintiff received "was a fruit of the seeds of disorder sown by the bartender" whether it was he or a patron who felled him.

However, that case is clearly distinguishable from the case at hand. There, the injury to the plaintiff occurred almost simultaneously with the violent action of the bartender who, if he did not strike plaintiff himself, surely would have in the next instant had not another done so.

The unsportsmanlike conduct of Deal which plaintiff alleges incited Adams to violence was not contemporaneous with the assault. Indeed, Adams was not present on the field while Deal was protesting the plaintiff's decision and no injury was inflicted upon plaintiff during the course of those altercations, nor was Deal present when Adams struck plaintiff. He knew nothing of Adams' intentions toward plaintiff and an appreciable length of time had elapsed since the altercation which caused plaintiff to eject Deal from the game. To say that Deal's conduct was a proximate cause of the attack on plaintiff would be pure speculation. No one can say whether Adams' assault on plaintiff was his own reaction to the umpire's ruling, to the "rhubarb" created by Deal, to both, or whether he was merely venting pent-up emotions and propensities which had been triggered by the epithets, dares, or challenges of one or more of the 3,451 other fans attending the game.

In *Bird v. Lynn,* 10 B. Mon. (Ky.) 422 (1850), the defendant Bird, who lived at the home of defendants Mr. and Mrs. Jouett, "whipped the plaintiff because he was in the habit of saucing Mrs. Jouett." Apparently, in Kentucky in that day, the liability of Mr. Jouett depended on the liability of Mrs. Jouett who was not present at the time of the assault. In exonerating the Jouetts the Court used language appropriate to this case:

> "As Mrs. Jouett was not present when the trespass was committed, the word *encourage* seems to be not sufficiently definite to express the true ground of liability. If Mrs. Jouett had directed Bird to whip or beat the plaintiff, and he had done it in consequence, this would, undoubtedly, have been an encouragement of the trespass, which would make her a party. If she had said in Bird's presence that the plaintiff was a bad boy and deserved a whipping, or that he had mistreated her, and she wished somebody would whip him, in consequence of which Bird had beaten him, this might, in some sense, have been deemed an encouragement of the trespass, and yet, unless she had used this language for the purpose or with the intention of inciting Bird to commit the act and of thus producing or procuring the trespass, we apprehend that Bird, though in fact committing the act, in consequence of what she had said, should be regarded as a mere volunteer, and that she would not be a co-trespasser on the ground of having encour-

TOONE *v.* ADAMS.

aged the trespass. To make Mrs. Jouett liable as having encouraged the trespass by words used on a prior occasion, those words must have had a direct relation to the trespass, and have been calculated and intended to produce it by stimulating or exciting some person hearing them to do the act or procure it to be done. If it were sufficient that the act was done in consequence of the words spoken, then one person might be made a trespasser and even a felon against his or her consent, and by the mere rashness or precipitancy or overheated zeal of another, and the mere expression of just anger or resentment, or the statement of a fact calculated to excite indignation against an individual, and to create an opinion or desire that he should be chastised, might make the party using such expressions or making the statement liable for the inconsiderate act of another. Under the operation of such a principle, there would be no safety except in such universal caution and reserve as is neither to be expected nor desired."

In the instant case neither we nor a jury could say that the conduct of Adams was "the fruit of the seeds of disorder" sown by Deal. At the time Adams injured plaintiff he was acting voluntarily and of his own accord. He is legally and morally responsible for his own wrongful acts, and plaintiff has obtained · a default judgment against him. The mere fact that both Adams and Deal may have become simultaneously enraged with the plaintiff for the same cause does not establish a concert of action. It would be an intolerable burden upon managers of baseball teams to saddle them with responsibility for the actions of every emotionally unstable person who might arrive at the game spoiling for a fight and become enraged over an umpire's call which the manager had protested. We hold that Adams' assault upon plaintiff was not so related to the unsportsmanlike conduct of Deal that it may be considered a natural and proximate result of it.

The judgment of the Superior Court sustaining the demurrer is

Affirmed.